# GALLUZZO JOHNSON LLP

48 WALL STREET, 11TH FL    NEW YORK, NY 10005
(212) 918-4661    www.gjllp.com

MATTHEW J. GALLUZZO                                        ERIC M. ARNONE
ZACHARY H. JOHNSON                                        *OF COUNSEL*

November 24, 2014

The Honorable I. Leo Glasser
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

**VIA ECF**

## DEFENDANT'S SENTENCING MEMORANDUM

*United States v. Thami Drissi*, 14-cr-00473(ILG)

    I.     Preliminary Statement

Thami Drissi is a fundamentally good man beloved by his family and friends and respected by his former colleagues. However, in an instant of moral weakness and terrible judgment, he committed a foolish crime and thereby practically ruined the excellent life that he had worked so hard to create for himself. As a result of his tragic mistake he has lost his job, he and his family have been humiliated by the press, his reputation and career prospects have been destroyed, his family's financial stability has been seriously jeopardized, and he has been completely separated from his wife, son, and newborn child for over three months. So deep are his feelings of shame, regret, loneliness and remorse that he cries virtually every day.[1] He asks most sincerely for the forgiveness of his victim, and, having openly and plainly admitted his

---

[1] See Pre-Sentence Investigation Report prepared by U.S. Probation ("PSR"), at paragraph 31.

guilt, he begs the Court for leniency in the form of a non-jail sentence. For the reasons set forth below, we submit that such a sentence would be sufficient and just under the circumstances.

II.     Procedural Background

On August 22, 2014, Mr. Drissi was arrested at John F. Kennedy Airport and arraigned on a complaint charging him with one violation of 18 U.S.C. 2244(b) and 49 U.S.C. § 46506(1). He was later arraigned on an indictment charging him with the same and on October 2, 2014, pursuant to a plea agreement with the United States, he pleaded guilty to the first count (see Exhibit A [indictment]; Exhibit B [plea agreement]).

III.     Background

A.     Mr. Drissi's Upbringing

Mr. Drissi is a dual citizen of France and Morocco. On the date of his arrest, he lived in Morocco with his wife and their two sons (one son was 4 years old and the other was one month old). A salesman for Cisco Systems with a background in computer systems engineering, he was the sole provider for his growing family. He also financially and morally supported his aging mother. He drew a solid salary from this job but was not wealthy and his family did not live extravagantly.

Family has always been supremely important to Mr. Drissi as he comes from a big and loving one. A native of Morocco, he has brothers and sisters spread across the globe, including some that now work in high-level professional positions in North America (see PSR, at 5). As a child, his father was employed evaluating movies for a Moroccan government agency responsible for rating and censoring films, and his mother was a homemaker. His childhood and upbringing were generally normal and happy and on the date of his arrest his relationships with his family were excellent.

2

B.   Mr. Drissi's Character

Mr. Drissi has a demonstrated track record of hard and honest work. Mr. Drissi's family was by no means poor, but as a young man he worked a variety of entry-level jobs in restaurants and shoe-stores to fund his own university education. After finally earning his degree in computer science engineering in 1996, Mr. Drissi immediately started working full-time, and he has been consistently employed in computer sales and engineering ever since. See Exhibit C [Mr. Drissi's English-language resumé, submitted under seal].

For the majority of the past fourteen years, Mr. Drissi worked as a technology consultant and salesperson for Cisco Systems, meaning that he traveled the world showing and selling new technology. In fact, in the past year, he visited the United States three times to attend seminars in San Jose and demonstrate new Cisco technologies to his clients. At the time of his arrest, he was en route to an annual Cisco employee conference in Las Vegas (GSX or "Global Sales Experience" conference), and was expecting to receive an award there for being an outstanding employee in 2014 (see attached Exhibit D [letter from Chuck Robbins, Senior Vice President at Cisco for Worldwide Field Operations]). However, he was suspended from work following his arrest and terminated following his conviction. His professional prospects are now particularly problematic because he lives in a relatively poor country with few if any other employers offering work even remotely comparable to the job that he had with Cisco. In short, if he loses this job, there is virtually no chance that he is going to be able to find another one like it. He will probably have to uproot his family and move to France to have any chance to salvage his career.

This is unfortunate because as the numerous character letters from his former colleagues demonstrate, Mr. Drissi was a very well regarded teammate and co-worker. Those that know him well are completely shocked by the accusations because they seem so incredibly out of character

3

for Mr. Drissi. It is clear from the numerous character letters that Mr. Drissi is a man with many positive and lovable qualities, and that, despite his mistake, there is a multitude of people hoping that the American criminal justice system grants him clemency. See Exhibit E [thirty-seven character letters submitted under seal]. It is also clear from this outpouring of support on his behalf that he has never given anyone any reason to suspect that he was capable of the sort of conduct that brings him now before the Court. Instead, his friends and family describe him as a family-oriented, respectful, generous, friendly and likeable man of sincerity, integrity and high professionalism.

Mr. Drissi's generosity and sincerity is further evidenced by the volunteer work that he has done for this community. In 2014, Mr. Drissi volunteered about three hours a week to give free networking courses and academic tutoring to underprivileged students in remote areas of Morocco through a program run by an organization called Injaz Morocco (see Exhibit F [email from Injaz in French thanking him for his participation submitted under seal]; see also www.injaz-morocco.org). This past year he also volunteered his time to raise funds for a charity devoted to assisting orphans (see Exhibit G [email from SOS Villages Des Enfants program in French thanking him for his participation in their fundraising program, submitted under seal]). Mr. Drissi considers this community service to be an essential part of his life and the Court should credit him for his demonstrated altruism.

    C.    Mr. Drissi's Current Circumstances and Outlook

The effects of this arrest have been devastating for him and his family. He surrendered his passport as a condition of his bail and his wife has been unable to visit him because of the expense of the flight and their need to care for their newborn child. As a result, he has not been able to see his wife and children in person for over three months.

Moreover, Mr. Drissi was the sole financial provider for his young family and supported his ailing mother, and this arrest has thus put an enormous financial strain on his family. His employer immediately suspended him following his arrest and they terminated him after his conviction by plea. As a result, his wife and children have had to subsist on their modest savings whilst Mr. Drissi awaits his opportunity to provide for them again. Of course, he has been unable to secure employment in the interim because he is not a lawful resident of the United States. Even an additional delay of 60 days without income could prove ruinous for his family, as his family might be forced to move out of their home for failure to keep up their mortgage payments.

His future effort to secure a new means of supporting his family is going to be especially challenging, too, given that his public name and reputation have been permanently ruined. Reports of the case immediately appeared in the American and foreign press following his arrest. The articles universally identified him by name and national origin and his place of employment. See Exhibit H [various online newspaper articles in English and French about Mr. Drissi's case]. His name is not so unique as to grant him anonymity in his home country, and given the media coverage in Morocco, it is safe to say that virtually everyone in his relevant community of potential employers is aware of the incident. Though his wife is a licensed physician, she has been unable to obtain one of the few available positions for employment as such in their region of Morocco. (Of course, she was also not working because she just gave birth to a son.) She and Mr. Drissi had contemplated opening her own medical practice but their savings have been depleted as a result of this case and they now lack the capital to start the business. Moreover, they cannot possibly afford to open an office for her until they know if, when, and where Mr. Drissi will be able to find another job. In short, they have no viable means of supporting themselves in the near future, and their savings are dwindling to untenable levels. Accordingly,

the defense submits that Mr. Drissi should be granted a downward departure based upon extraordinary family circumstances pursuant to U.S.S.G. § 5H1.6.

Finally, Mr. Drissi will be immediately removed from this country following the completion of this case or his term of incarceration. He was arrested at John F. Kennedy International Airport ("JFK") without ever being legally admitted into the country (i.e. he did not pass inspection). Once he made bail on his criminal matter, agents from Customs and Border Protection ("CBP") took custody of him pursuant to an immigration detainer. From there, he was paroled into the United States pending the prosecution of the instant case. As a result, he has been periodically reporting to agents from CBP throughout this case, much as he has been to U.S. Pre-trial Services. The undersigned has been informed by agents from CBP that the moment that this case is completed they intend to take him forthwith to the airport and put him on the very next available plane flight bound for Morocco. There will not be a "deportation proceeding" as he has no legal standing in the United States whatsoever – not having been admitted, his removal back to Morocco will technically be an administrative "refusal of entry". Based upon the undersigned's conversations with It is quite possible that agents from CBP will actually be present in the courtroom for Mr. Drissi's sentencing, so that in the event that he is sentenced to a non-jail sentence, he can be delivered immediately to JFK and put on the next flight home.

This conviction will also render Mr. Drissi unable to return to the United States in the future. Pursuant to INA § 237(a)(2)(A)(i) and 8 U.S.C. § 1227(a)(2)(A)(i), his conviction for this charge – a crime involving moral turpitude with a maximum possible penalty greater than one year – renders him inadmissible and removable. Accordingly, the Court need not fear that Mr.

6

Drissi will ever pose a threat to the American public again, as it would simply be impossible for him to ever come back.[2]

### D. The facts of the case

The facts of this case are extraordinary in that, unlike the typical federal crime that involves a deliberate, continuing, and orchestrated criminal act or conspiracy, this arrest was the result of a terrible but very momentary lapse of judgment. Moreover, this case is uncommon because the defendant is a foreign tourist with virtually nothing in his background or character to suggest that he would ever commit such a foolish act. In truth, an arrest for conduct like his would more typically be prosecuted in state court, notwithstanding the fact that it happened on an international airplane flight inbound to the United States.

On the date of his arrest, Mr. Drissi was flying on Royal Air Maroc from his home country to Las Vegas (via layover at JFK) for a work-related conference with two other colleagues.[3] His employers intended to present him with an award for outstanding service at this conference.[4] Mr. Drissi and the complainant were seated next to each other on the plane and they struck up a pleasant conversation as Mr. Drissi consumed some wine. The young woman showed Mr. Drissi pictures of her travels abroad and they laughed and enjoyed each other's company. Sadly and most regrettably, though, he grossly misinterpreted her friendliness and touched her inappropriately after she fell asleep next to him on the plane. The victim awoke and promptly reported the crime on the airplane and Mr. Drissi was arrested at the airport. Though this crime is

---

[2] This is particularly problematic for his career prospects as many of the biggest clients and employers in the industry are American (it is for this reason that Mr. Drissi used to fairly regularly visit the United States – to meet American clients).

[3] The conference was the "GSX" or Global Sales Experience annual Cisco Systems conference.

[4] See Exhibit D [letter from Cisco Systems management informing Mr. Drissi that he would be presented with an award at the GSX conference).

7

hurtful and shameful, it was clearly neither premeditated nor ongoing nor deliberately planned. As a result, the Court should grant Mr. Drissi a downward departure pursuant to Sentencing Guideline § 5K2.20. See also United States v. Huckins, 529 F.3d 1312 (10th Cir. 2008) (affirming downward variance in possession of child pornography and criminal forfeiture case based, *inter alia*, on short time period in which the offense took place and lack of repeat offending by the defendant after his arrest).

> E.  Comparison to similar cases

Mr. Drissi is not the first person to be arrested for this exact same crime in the Eastern District of New York. Indeed, at least two other people have been arrested at JFK in the past few years based upon near identical allegations.[5] Both of them received sentences of sixty days in jail despite facts and circumstances more egregious than those present here.

Consider first, for example, the 2012 case of *United States v. Othniel Polanco*, CR-12-703 (VMS). In that case, the defendant was flying into JFK on an international airplane flight when was observed touching the genitals of the 18-year-old passenger sleeping in the seat next to him.[6] Mr. Polanco was arrested at JFK and charged in a complaint with exactly the same charges as in the indictment against Mr. Drissi: violations of 18 U.S.C. §§ 2244(b) and 113(a)(5). However, Mr. Polanco was permitted to plead guilty – by misdemeanor information – to only simple assault in violation of 18 U.S.C. § 113(a)(5). During his pre-sentencing interview with the Department of Probation, Mr. Polanco apparently denied his guilt of the charge, surprisingly claiming that he couldn't remember what happened at the moment of the crime because he had

---

[5] These are the only two comparable and recent cases in the Eastern District of New York of which the undersigned is aware.

[6] See attached Exhibit I [complaint for *U.S. v. Polanco*]; attached Exhibit J [press reports from online newspapers relating to case against Othniel Polanco].

been under the influence of prescription medication.[7] He also failed to demonstrate any remorse for his actions or sympathy for his victim. Even more egregiously, Mr. Polanco demonstrated such repeated and "indignant" behavior during his pre-trial release period that Pre-Trial Services submitted four violation memoranda prior to his sentencing.[8] As a result of his refusal to accept responsibility for his actions and his demonstrated inability to abide by the court's instructions, the government recommended that he receive a sentence of six months in prison. Ultimately, however, Judge Vera M. Scanlon sentenced him to just 60 days in jail (see Exhibit L [judgment in *U.S. v. Polanco*]). It is unclear whether he had immigration consequences but it appears that he was a resident of Queens, at least. See generally Exhibit H [press reports for *U.S. v. Polanco*].

In 2011, a rabbi named Gavriel Bidany was arrested at JFK after sexually abusing the sleeping passenger next to him on an international airplane flight bound for New York.[9] That sleeping passenger was a female soldier in the Israeli Defense Force, and she later explained to the court that she felt especially traumatized to have been abused by a rabbi.[10] Again, Mr. Bidany was originally charged with the same crimes as Mr. Drissi, but the Department of Justice chose to proceed to trial on misdemeanor assault charges only, rather than indict Mr. Bidany. The victim was forced to go on the witness stand and recount how Mr. Bidany had sexually assaulted her, and she underwent an invasive cross-examination by his attorney. Further compounding this offense, Mr. Bidany proclaimed his innocence under oath. The court ultimately convicted Mr. Bidany despite his apparently false and tailored testimony. At sentencing, Mr. Bidany received a

---

[7] See attached Exhibit K [Prosecution's Sentencing Memorandum in *U.S. v. Polanco*], at page 3.

[8] See Exhibit I [Prosecution's Sentencing Memorandum in *U.S. v. Polanco*], at 4.

[9] See Exhibit M [complaint in *U.S. v. Bidany*].

[10] See Exhibit N [press reports from case of *U.S. v. Bidany*].

9

sentence of sixty days jail, despite the prosecution's demands for a sentence of six months in jail. See Exhibits O [prosecution's sentencing memorandum from *U.S. v. Bidany*, at p. 2]; Exhibit P [judgment from *U.S. v. Bidany*]. Like Mr. Drissi, Mr. Bidany was apparently also a foreign national (in his case, an Israeli), but it is possible that his conviction for a misdemeanor might not even render him inadmissible to the United States in the future.[11]

In sum, both Polanco and Bidany were guilty of exactly the same conduct in the same jurisdiction as Mr. Drissi, and both received sentences of sixty days in jail. This is especially notable because their cases had serious aggravating circumstances not present in the instant case: Bidany testified falsely at trial, and Polanco committed numerous pre-trial violations and then denied his guilt of the crime in his pre-sentencing interview.

IV. Analysis

A. Sentencing Framework

There is no mandatory minimum prison sentence for this conviction. See 18 U.S.C. §2244(b) and 49 U.S.C. § 46505(1). Pursuant to the United States Sentencing Guidelines (hereinafter "Guidelines,"), Mr. Drissi's base offense level for this conviction is 12. He has no prior criminal record whatsoever in this country or any other.[12] In addition, the parties agree that Mr. Drissi should be entitled to a two-point reduction as a result of his guilty plea, pursuant to

---

[11] Mr. Bidany might not be inadmissible to the United States in the future based upon the petty offense exception. See INA § 212(a)(2)(A) (II), 8 U.S.C. § 1182(a)(2)(A) (II).

[12] See Exhibits O [criminal history report from Morocco] & P [criminal history report from France], both submitted under seal in light of the confidential information that they contain. Both Exhibits O and P indicate that Mr. Drissi has no criminal record whatsoever in either of his native countries. Obviously, Exhibit P is entirely in French, but the words at the bottom of the page ("En l'absence de condamnation devant figurer au bulletin no.3, celui-ci ne comporte qu'une barre transversal") mean: "In the absence of a conviction… this contains nothing but a diagonal line." The French Ministry of Justice (Ministère de la Justice de la République Française) delivered this document to the Consulate General of France in New York (hence the address of 934 Fifth Avenue, which is the Consulate's address).

10

U.S.S.G. §3E1.1(a) (see PSR, at paragraphs 8, 17; Exhibit B, at p.2).[13] Accordingly, the Guidelines suggest either a sentence of between 6-12 months incarceration, or, in the alternative, one month of prison followed by a term of supervised release pursuant to Guidelines § 5C1.1(c)(2). See also PSR, at paragraph 43. Of course, as a practical matter, Mr. Drissi cannot serve a sentence of probation or home detention nor perform community service nor undergo counseling because his immigration status will not allow him to be involved in those things.[14]

Though this charge involves a crime from chapter 109A, the Court is not required to abide by the provisions of 18 U.S.C. § 3553(b)(2) in determining the appropriate sentence for Mr. Drissi. In U.S. v. Selioutsky, 409 F.3d 114, 117 (2nd Cir. 2005), the Second Circuit determined that those sentencing restrictions were excised by the Supreme Court's decision in United States v. Booker, 543 U.S. 220 (2005). Instead, the Court is required to consider the sentencing factors contained in § 3553(a) and any available departure authority. Of course, a sentencing judge has the discretion to consider a variance under the totality of the §3553(a) factors, see e.g. United States v. Cavera, 550 F.3d 180, 191 (2nd Cir. 2008), and the defense respectfully requests that you do so here for the reasons set forth below.

    B.    Consideration of the 18 U.S.C. § 3553(a) factors merits leniency

As the pre-sentencing investigator correctly summarized, this impulsive crime by Mr. Drissi appears to have been an "aberration in any otherwise law-abiding life." See PSR, at

---

[13] The Court should note that Mr. Drissi's acceptance of responsibility is sincere and extends beyond his guilty plea. In fact, during his interview with the pre-sentence investigator, he insisted on making clear his remorse (see PSR, at paragraph 7). The pre-sentencing investigator has also informed us that the victim intends to be present in the courtroom for sentencing, see PSR Addendum, and Mr. Drissi intends to apologize most sincerely to her in person.

[14] It should also be noted that although this charge would normally result in his registration as a sex offender, that requirement does not apply because Mr. Drissi cannot and will not be a resident of the United States following his sentence.

paragraph 59. Taking into account how much Mr. Drissi and his family stand to suffer as a result of this conviction, as well as how much they have already suffered as a result of his arrest, a sentence below those recommended by the Guidelines would be an appropriate exercise of judicial mercy.[15] It would also be reasonable pursuant to the factors that must be considered in crafting an appropriate sentence, and the defense submits that it would be simply unjust for him to receive a sentence greater than those given to two other defendants – Polanco and Bidany, described supra - that were less deserving of leniency than Mr. Drissi.

1. The nature and circumstances of the offense (§3553(a)(1))

On the spectrum of federal crimes, this one plainly deserves to be treated more leniently than most. Unlike the numerous conspiracies or ongoing courses of conduct or deliberately planned crimes that so frequently present themselves in federal court, this crime was an impulsive crime of opportunity that lasted mere minutes, at most. Here, the crime was not committed pursuant to a carefully orchestrated scheme to profit illegally but was perpetrated by an otherwise good and law-abiding person in a moment of moral weakness and terrible judgment. This is the rare federal case involving a man that made one quick and terrible decision that hurt somebody else and also ruined his own life in an instant.

Mr. Drissi fully recognizes the seriousness of his crime, however. Indeed, he has been filled with regret and shame since the date of his arrest and cries nearly daily. See PSR, at paragraph 31. He is no sociopath, though: he admitted his guilt and pleaded guilty at an early opportunity, he volunteered an apology to his pre-sentence interviewer, and he intends to apologize directly to the complainant for his actions. He also fully recognizes just how harmful

---

[15] See USSG § 5H1.6.

his actions were and just how upset he would have been had one of his female family members been a victim of such a crime. See PSR, at paragraph 7.

That being said, there is a reason why there is no minimum jail sentence under the law for this crime. For comparison's sake, under New York state law, it would have been a misdemeanor[16] to do what Mr. Drissi did, and the vast majority of individuals convicted of committing crimes like this one in New York state courts receive non-jail sentences.[17] Indeed, it appears to be – or at least to have recently been – the policy of this U.S. Attorney's Office to normally charge this conduct as a misdemeanor assault rather than indict it as a felony. See supra at Part III.E. The only rational explanation for this is that the prosecutors themselves considered the sentencing guidelines for the felony charge to be unduly harsh for the conduct at issue.

In sum, the defense submits that Mr. Drissi's crime ought to be treated with leniency, as it is less indicative of a true criminal mentality than those crimes involving deliberate and on-going schemes.

---

[16] See New York Penal Law 130.52 (Forcible touching): "A person is guilty of forcible touching when such person intentionally and for no legitimate purpose, forcibly touches the sexual or other intimate parts of another person for the purpose of degrading or abusing such person, or for the purpose of gratifying the actor's sexual desire. For the purposes of this section, forcible touching includes squeezing, grabbing or pinching. Forcible touching is a class A misdemeanor." See also New York Penal Law 130.55 (Sexual abuse in the third degree): "A person is guilty of sexual abuse in the third degree when he or she subjects another person to sexual contact without the latter's consent… Sexual abuse in the third degree is a class B misdemeanor."

[17] There are no readily available statistics on the sentencing outcomes of misdemeanor sexual abuse cases in New York state courts, but the undersigned can confidently state that in his extensive experience as a state court defense attorney and former state court sex crimes prosecutor in Manhattan, misdemeanor sexual assault crimes involving first time offenders typically result in sentences involving counseling and conditional discharges without jail. Sometimes, in fact, these cases even result in plea bargains involving non-criminal violations for which the offender receives no criminal conviction at all. The only difference between the those typical state court cases and this case, insofar as it is relevant for an analysis pursuant to 18 U.S.C. § 3553(a)(6), is 1) that this case is being prosecuted in federal court, and 2) that it happened on an international plane flight (as opposed to say a bus or a subway train).

2.  The history and characteristics of the defendant (§3553(a)(1))

Mr. Drissi had obviously lived a law-abiding life for forty-five years and has demonstrated that he was a motivated and intelligent person without any psychological abnormalities or substance abuse issues. Moreover, as the numerous character letters confirm, Mr. Drissi has seemingly never done anything prior to this case to make anyone believe that he was capable of sexual abuse. It is for this reason that the pre-sentencing investigator concluded that this crime was "an aberration in an otherwise law-abiding life." Accordingly, given that his history suggests that he is unlikely to re-offend, the Court should have no reservations about sentencing him to the legal minimum. See United States v. Autery, 555 F.3d 864 (9th Cir. 2009) (affirming downward variance from a guideline range of 41-51 months to five years probation in possession of child pornography case based in part on finding that the defendant did not fit the profile of a pedophile, had no history of substance abuse, no interpersonal instability, was motivated and intelligent, and had the continuing support of his family).

3.  Just punishment and effective deterrence (§3553(a)(2))

In contemplating whether the minimum permissible sentence would provide just punishment and effective deterrence as required by 18 U.S.C. § 3553(a)(2), the Court should consider the collateral consequences that Mr. Drissi has already suffered as a result of his conviction. At the time of his arrest, Mr. Drissi was successfully employed as a professional, and now, as a result of his conviction, it is doubtful whether he will ever be able to resurrect his career or work meaningfully in a professional setting ever again. Thus, he and his family have already suffered a tremendous financial loss and may be forced to leave their home to seek work elsewhere.

In addition, the defense would submit that Mr. Drissi's total separation from his wife and children for the past several months during the pendency of this case has been at least as emotionally devastating for him as any home confinement or detention could possibly be. Indeed, in a sense, he has been confined in a place that is not his home since his arrest in August, and every day he has agonized over his separation from his family and the shame that he has brought upon them. Nevertheless, as the letters from his wife and other family members show, he has their continuing support. See United States v. Martin, 520 F.3d 87 (1st Cir. 2008) (affirming a 91-month variance down from the guideline range based in part on "the support that the defendant stood to receive from his family [and] personal qualities indicating his potential for rehabilitation").

Finally, he has been publicly humiliated by the press coverage in a way that would indisputably have a deterrent effect on anyone following the case. See Exhibit F [press reports about Drissi case]; see also United States v. Anderson, 533 F.3d 623 (8th Cir. 2008) (affirming a downward variance based in part on "other ways in which the defendant had suffered atypical punishment such as the loss of his reputation...").

    4.    Protection of the public from further crimes (§3553(a)(2))

In fashioning the appropriate sentence, the Court is also required to consider the protection of the public from further crimes committed by the defendant. See 18 U.S.C. § 3553(a)(2). Here, the character of the defendant (as attested to by his numerous friends and family) and his law-abiding history strongly suggest that he is unlikely to re-offend. Indeed, having lost his job and suffered tremendous humiliation as a result of this arrest and conviction, Mr. Drissi would not possibly consider risking such an act again. As a practical matter, though, Mr. Drissi *cannot* ever possibly threaten the American public again because he will be removed

15

from the United States and will thereafter be inadmissible to the United States. Accordingly, the Court should recognize that a term of incarceration is not necessary to protect the public from future criminality by Mr. Drissi. See U.S. v. Szanto, 2007 WL 3374399 (N.D. Ill. Nov. 8, 2007) (granting downward variance where, *inter alia*, the defendant was a foreign citizen and had agreed to be deported).

          5.      The need to avoid unwanted sentence disparities (§3553(a)(6))

Lastly, this Court must consider the need to avoid unwanted sentence disparities amongst individuals convicted of similar conduct, see 18 U.S.C. § 3553(a)(6), and this final factor weighs strongly in favor of Mr. Drissi receiving a non-jail sentence, or at least a sentence of less than sixty days in jail. Sentencing Mr. Drissi to something equal to or greater than the sentences imposed upon Mr. Polanco or Mr. Bidany would be unjust and unfair because Mr. Drissi is objectively more deserving of leniency than they were.

Mr. Drissi did not testify falsely at trial or force his complainant to re-live his abuse under cross-examination, as Mr. Bidany did. Mr. Drissi did not deny his guilt in his pre-sentencing interview or commit numerous violations of his pre-trial release as Mr. Polanco did. Moreover, he stands to suffer immigration consequences – i.e. permanent inadmissibility to the United States – that neither Polanco nor Bidany seemingly endured. In short, there are no aggravating circumstances in Mr. Drissi's but there were serious and significant ones in the cases of the two individuals that received 60-day sentences for identical conduct. The fact that the U.S. Attorney's Office chose to indict Mr. Drissi (in the first week following his arrest) as opposed to prosecute him via misdemeanor complaint should not – and does not – bind this Court to a sentencing framework that did not apply to their misdemeanor charges. This charging distinction between the cases of Mr. Drissi and Misters Polanco and Bidany is essentially illusory as their

criminal conduct was virtually identical. All three cases (Drissi, Polanco and Bidany) were publicized in the press, and if the Court were to sentence Mr. Drissi more harshly than those other two individuals it would certainly invite the question of why, given that he did not aggravate the situation in the manner that the other two defendants plainly did. See United States v. Martin, 520 F.3d 87 (1st Cir. 2008) ("district courts have discretion, in appropriate cases, to align codefendants' sentences somewhat in order to reflect comparable degrees of culpability – at least in those cases where disparities are conspicuous and threaten to undermine confidence in the criminal justice system").

Finally, it is worth noting that a Guidelines-range sentence for this crime would be grossly disproportionate to the sentence that one might expect to receive for nearly identical conduct in a New York state court (the only difference being the fact that this crime happened on an international airplane flight). See supra footnote 17.

V.   Conclusion

Mr. Drissi begs for the forgiveness of the Court and complainant. He has already been publicly humiliated and ruined and his young family is suffering without him. This crime was a stupid, impulsive and aberrational act by a person that has otherwise lived an exemplary and honest life. Accordingly, he is deserving of a sentence well below those suggested by the Sentencing Guidelines, and it would be an appropriate and just exercise of judicial discretion to simply allow him to be sent back to his home country, from where he will never be allowed to return. Accordingly, we respectfully request that the Court consider granting him downward variances and departures from the range under the Guidelines and sentence him to a non-jail sentence, which would be the minimum permissible sentence under the law, and which would be

sufficient but not greater than necessary to further the purposes of sentencing and the interests of justice.

                          Respectfully submitted,

By: _____

Matthew J. Galluzzo, Esq.
Attorney for Thami Drissi
GALLUZZO & JOHNSON LLP
48 Wall Street, 11th Floor
New York, New York 10005
(212) 918-4661

CC:

Assistant U.S. Attorney Mathew Miller
U.S. Attorney's Office
Eastern District of New York
271 Cadman Plaza East
Brooklyn, New York 11201

VIA ECF

# TABLE OF EXHIBITS

| Exhibit | Description |
| --- | --- |
| A | Indictment for U.S. v. Drissi |
| B | Plea agreement for U.S. v. Drissi |
| C | Thami Drissi resumé (submitted under seal) |
| D | Letter from GSX |
| E | Character letters (submitted under seal) |
| F | E-mail (in French) from Injaz program (submitted under seal) |
| G | E-mail (in French) from SOS Villages Des Enfants (under seal) |
| H | Various online news articles about Thami Drissi |
| I | Complaint from U.S. v. Polanco |
| J | Various online press reports about U.S. v. Polanco |
| K | Government's sentencing memorandum from U.S. v. Polanco |
| L | Judgment from U.S. v. Polanco |
| M | Complaint from U.S. v. Bidany |
| N | Various online press reports about U.S. v. Bidany |
| O | Government's sentencing memorandum from U.S. v. Bidany |
| P | Judgment from U.S. v. Bidany |
| Q | Morocco criminal history report for Thami Drissi (under seal) |
| R | France criminal history report for Thami Drissi (under seal) |